The H. W. WILSON COMPANY,
Plaintiff,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

No. 76 Civ 3200.

United States District Court,
S. D. New York.

Oct. 12, 1977.

Sullivan & Cromwell, John L. Warden, Lista M. Cannon, New York City, for plaintiff.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Annette H. Blum, Sp. Asst. U. S. Atty., New York City, for defendant.

MEMORANDUM AND ORDER

BRIEANT, District Judge.

Both parties in this action have moved for summary judgment pursuant to Rule 56, F.R.Civ.P. The legal issue presented is whether certain of plaintiff's publications, including the well known *Index to Legal Periodicals* are "periodical publications" and thus entitled to second class mail privileges within 39 U.S.C. §§ 4351 and 4354.

Plaintiff H. W. Wilson Company (hereinafter "Wilson") is a New York corporation,

with its principal offices and a printing plant in Bronx County, New York, in this District. Wilson is the publisher of *Cumulative Book Index, Readers' Guide to the Periodical Literature ("Readers' Guide"), Education Index, Abridged Readers' Guide to Periodical Literature ("Abridged Readers' Guide"), Biological & Agricultural Index, Social Sciences & Humanities Index* and *Applied Science & Technology Index,* in addition to *Index to Legal Periodicals.*

The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1339.

Defendant United States Postal Service (hereinafter "Postal Service") through its Mail Classification Division director, Mr. Darwin Sharp, notified Wilson by letters dated February 12 and April 30, 1973 of the Postal Service's intention to revoke the second class mailing privileges of the publications named above. A hearing was had before an Administrative Law Judge (hereinafter "ALJ") of the Postal Service, and the ALJ (Initial Decision, P.S. Docket No. 2/66, Sept. 25, 1975) and later the Postal Service's judicial officer (Postal Service Decision, P.S. Docket No. 2/66, June 28, 1976) upheld the revocations.

Wilson sought review of the final agency action by filing this action on July 20, 1976.

The parties agree, and the Court finds, that there is no genuine issue of material fact, and the sole issue is one of law: whether the second class mailing status of Wilson's publications should be revoked because they are not "periodical publications."

The controlling statutes, set forth below,[1] do not define the term "periodical." The Postal Service maintains that the decision of the United States Supreme Court in *Houghton v. Payne,* 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904) controls the definition of a periodical, and that the Wilson publications are not periodicals as defined by *Houghton.* Accordingly, it is contended, they are not entitled to retain second class mail privileges. Wilson urges that the *Houghton* rule with respect to the definition of "periodicals" should not be read with the same rigidity now sought to be applied by the Postal Service, and deny that the definition is all-inclusive.

Issues of *Index to Legal Periodicals*[2] are published monthly in the Bronx, New York in softcover form for annual subscribers. The monthly issues are cumulated, the contents rearranged in order of entries, and republished quarterly in softcover form. Thereafter, the cumulative quarterly volumes are again rearranged on an annual basis, and reissued in a hardcover volume. Upon receipt of a quarterly volume, subscribers discard the monthly issues, and when an annual hardcover volume is received, the quarterly softcover volumes are discarded. The annual hardcover volume is regarded as a permanent library reference.

The status of the hardcover annual editions as periodicals is not in issue here, since Wilson has never applied for second class mail privileges with respect to those publications. We are thus concerned only with the character and status of the softcover publications.

1. "[39 U.S.C.] § 4351. Definition

Second class mail embraces newspapers and other periodical publications when entered and mailed in accordance with sections 4352–4357 of this title."

"[39 U.S.C.] § 4354. Conditions for entry of publications
(a) Generally a mailable periodical publication is entitled to be entered and mailed as second class mail if it—
(1) is regularly issued at stated intervals as frequently as four times a year and bears a date of issue and is numbered consecutively;
(2) is issued from a known office of publication;
(3) is formed of printed sheets;

(4) is originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or a special industry; and
(5) has a legitimate list of subscribers."

2. The parties agreed that testimony before the ALJ by users of the Wilson publications would be limited to testimony by users of *Index to Legal Periodicals* but would be applicable to all Wilson publications subject to the revocation proceedings. Testimony with respect to creation of the indexes was also limited to a discussion of *Index to Legal Periodicals.* The other publications mentioned differ only in that they concern different disciplines.

*Index to Legal Periodicals* serves two purposes. An examination of the monthly issue alerts judges, lawyers, law professors and law students to recently published articles. In addition, a lawyer researching a particular subject, topic or legal issue may, by a single examination of this publication, gain entry into some 360 current periodicals. These periodicals are a diverse group and include the *Harvard, Buffalo, Brooklyn* and *Columbia Law Reviews, Les Cahiers de Droit, Revista del Colegio de Abogados de Puerto Rico, Tasmania University Law Review, Oil & Gas Tax Quarterly* and *The Irish Jurist*, as well as the *Queen's Law Journal*.

A skilled editorial staff employed by Wilson creates the index by reading and analyzing the contents of articles, and applying their judgment, often after consultation, to a selection of the headings and cross references under which an article should be placed. The titles of the articles, the authors, and the journal in which the article can be found are arranged under appropriate abbreviated listings by subject.

The editorial staff members are not mere listers or indexers. All of the members have library backgrounds, and most of the members have master's degrees in library science. In addition, each staff member is highly trained and knowledgeable in the specific subject matters for which he or she is responsible.

The journals which are to be indexed by a publication such as *Index to Legal Periodicals* are determined on the basis of subscriber input[3] and after consultation with a committee of the American Association of Law Libraries.

In addition to the articles arranged by subject matter and an author index, an

issue of *Index to Legal Periodicals* contains a list of abbreviations created by Wilson and used therein, a list of the journals indexed, and a table of cases commented upon in the articles.

The initial second class mail permit for a Wilson publication was issued in 1898 for the *Cumulative Book Index*.[4] This publication was re-entered as second class matter on thirteen different occasions solely because of changes in the frequency of issue of the publication or changes in mailing locale. All of the publications were re-entered as second class matter several times for the reason(s) already stated. The second class status of *Readers' Guide* was revoked for a fourteen year period from 1909 to 1925 but reapproved in 1925.

The concept, purpose, format and content of the Wilson publications have not changed materially since 1898.

In a 1964 proceeding, the Post Office Department proposed to revoke the second class mail privileges of four of the eight publications now in issue.[5] The same question now before us, whether the publications are periodicals, was then at issue. No administrative determination was made then, because both the Chief Hearing Officer and the judicial officer on appeal, concluded that the notices of proposed revocation were defective. Thereafter, until the present proceedings, the Postal Service took no further action with respect to revocation of the Wilson publications' second class privilege. Indeed, many of the publications were re-entered as second class matter between the termination of the 1964 proceeding and the present revocation proceedings.

The parties agree that the Wilson publications meet the technical requirements of 39 U.S.C. § 4354, reproduced in part earlier

---

3. The subscription fee to Wilson publications is determined by the number of periodicals indexed which the subscriber has available in his or its own library. In other words, the fee is measured by the utility of the Wilson publication to the subscriber.

4. Original second class mail privileges were entered for *Readers' Guide* in 1900, *Social Sciences & Humanities Index* in 1904, *Index to*

*Legal Periodicals* in 1914, *Biological & Agricultural Index* in 1924, *Applied Science & Technology Index* in 1925, *Education Index* in 1929, and *Abridged Readers' Guide* in 1935.

5. The four publications for which revocation was proposed were *Cumulative Book Index, Index to Legal Periodicals, Readers' Guide* and *Education Index*.

at footnote No. 1 of this opinion. Thus the sole issue for determination is whether the publications are "periodicals."

Because the Court finds and concludes that the Postal Service applied the wrong legal standard to determine whether or not the publications are periodicals, and because the Wilson publications demonstrate the "essential attributes" of periodicals, the decisions of the Administrative Law Judge and Judicial Officer are set aside.

Where, as here, the sole dispute concerns the meaning of a statutory term, a question of law is presented. The Administrative Procedure Act, which sets forth the scope of judicial review of agency action, provides that a "reviewing court shall decide all relevant questions of law, [and] interpret . . . statutory provisions . . . ." 5 U.S.C. § 706. For agencies do their agency business, and courts do the business of courts, that is, construe statutory language and the prior decisions of higher courts.

The Postal Service urges that *Houghton v. Payne*, 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904), defined a "periodical," for all time, as "a publication appearing at stated intervals which contains a variety of *original* articles by different authors." (Emphasis added).

Since the Wilson publications contain no original articles, contends the Postal Service, they are not periodicals.

In addition, the Postal Service maintains that two other *Houghton*-imposed characteristics for periodicals are not satisfied by the Wilson publications: they are not incomplete in themselves, since they index all articles published during a specific time period; and they have no continuity of literary character, having no literary character whatsoever because they have no articles. All this is said to be required by *Houghton, supra.*

The publications involved in *Houghton* were softcover reprints of standard, well-known works by such authors as Thackeray,

Whittier, Lowell, Emerson and Irving, re-issued under the title, *Riverside Literature Series,* long after their first publication. They were issued monthly or quarterly, and numbered consecutively. Each number of the "series" was complete in itself, and "entirely disconnected with every other number." *Houghton,* at 95, 24 S.Ct. at 591.

In *Houghton,* at issue was whether a given publication was a "book" or a "periodical." Thus the factual context is different from the instant case. In construing the statutory term, "periodical," the *Houghton* court said:

"Under section 10 the publication must be a 'periodical publication,' which means, we think, that it shall not only have the feature of periodicity, but that it shall be a periodical in the ordinary meaning of the term." (p. 96, 24 S.Ct. p. 592).[6]

Making it clear that it was attempting to distinguish between periodicals and books, the Supreme Court continued:

"A periodical, as ordinarily understood, is a publication appearing at stated intervals, each number of which contains a variety of original articles by different authors, devoted either to general literature of some special branch of learning or to a special class of subjects. Ordinarily each number is incomplete in itself, and indicates a relation with prior or subsequent numbers of the same series. It implies a continuity of literary character, a connection between the different numbers of the series in the nature of the articles appearing in them, whether they be successive chapters of the same story or novel or essays upon subjects pertaining to general literature. If, for instance, one number were devoted to law, another to medicine, another to religion, another to music, another to painting, etc., the publication could not be considered as a periodical, as there is no connection between the subjects and no literary continuity. It could scarcely be supposed that ordinary readers would

---

**6.** Section 10 of the Post Office Appropriation Bill, 20 Stat. 355 (March 3, 1879), referred the reader to Section 14 of the same statute. Section 14 is substantially identical except for punctuation, to 39 U.S.C. § 4354, which applies to the Wilson publications.

subscribe to a publication devoted to such an extensive range of subjects.

A book is readily distinguishable from a periodical, not only because it usually has a more substantial binding, (although this is by no means essential), but in the fact that it ordinarily contains a story, essay or poem, or a collection of such, by the same author, although even this is by no means universal, as books frequently contain articles by different authors. Books are not often issued periodically, and, if so, their periodicity is not an element of their character. The reason why books of the Riverside Literature Series are issued periodically is too palpable to require comment or explanation. It is sufficient to observe that, in our opinion, the fact that a publication is issued at stated intervals, under a collective name, does not necessarily make it a periodical. Were it not for the fact that they are so issued in consecutive numbers, no one would imagine for a moment that these publications were periodicals and not books. While this fact may be entitled to weight in determining the character of the publication, it is by no means conclusive, when all their other characteristics are those of books rather than those of magazines." (pp. 97–98, 24 S.Ct. p. 592).

Careful analysis of these passages discloses that both books and periodicals may have articles by a variety of authors, but that periodicity is not an element of books, and that a book cannot become a periodical merely by its issuance at stated intervals as part of a series of similar books.

■ Thus the "essential attributes" of periodicals not shared by books are: (1) periodicals are incomplete in themselves and relate to prior or subsequent numbers of the same series; and (2) there is a continuity of literary character, a connection, among the various issues. Since both books and periodicals could have a variety of articles by different authors, the "variety of original articles" element is not an *essential* attribute of periodicals which *distinguishes* them from books.

We must remember the admonition that "[w]e are not to 'shut our minds' as judges to truths that 'all others can see and understand.' " [7]

The Court is aware that numerous publications, such as *The New Yorker, Esquire* or *Ladies Home Journal,* to name but a few, are commonly regarded as periodicals and accorded second class mail privileges. These publications are complete in themselves in that it is usually not necessary to refer to a prior or subsequent issue in order to obtain a more complete benefit or understanding from the current issue. There is very often little or no connection among the issues of these periodicals. Yet periodicals they are, even though they do not display the essential attributes mentioned in *Houghton.*

The limited nature of the actual holding of *Houghton* appears from the Court's contemporaneous restatement of that holding, in *Bates & Guild Co. v. Payne,* 194 U.S. 106, 24 S.Ct. 595, 48 L.Ed. 894 (1904). There, the Court held (at p. 107, 24 S.Ct. at p. 596):

"[T]he principle established in the two cases just decided [is] . . . that books published at stated intervals and in consecutive numbers do not thereby become periodicals . . . ."

The statute does not require that periodicals contain a variety of original articles by different authors. Section 4354(a)(4) requires that the periodical be "published for the dissemination of information of a public character, *or* devoted to literature . . ." Clearly, the Wilson publications disseminate

7. This quotation was attributed to Chief Justice Taft by (then) Judge Cardozo, in *McGovern v. City of New York,* 234 N.Y. 377, 392, 138 N.E. 26, 32 (1923), who there referred to *Bailey v. Drexel Furniture Co.,* 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1921). In *Bailey,* the Supreme Court, referring to a tax on the employment of child labor, wrote, per Chief Justice Taft:

"[A] court must be blind not to see that the so-called tax is imposed to stop the employment of children within the age limits prescribed. Its prohibitory and regulatory effect and purpose are palpable. All others can see and understand this. How can we properly shut our minds to it?"

information of a public character. In any event, the parties do not dispute that the requirements of this section are met.

In a case later than *Houghton*, where the same issue arose as to whether a particular publication was a book or periodical, the Supreme Court in *Smith v. Hitchcock*, 226 U.S. 53, 59–60, 33 S.Ct. 6, 8, 57 L.Ed. 119 (1912) said:

> "Without attempting a definition we may say that generally a printed publication is a book when its contents are complete in themselves, deal with a single subject, betray no need of continuation, and, perhaps, have an appreciable size. There may be exceptions, as there are other instances of books. It hardly would be an exception if, *where the object is information and the subject-matter is a changing one*, a publication periodically issued giving information for the time should be held to fall into the second class." (Emphasis added.)

 The Wilson publications inform their subscribers where current articles of specialized interest may be found, and under what subject-matter heading(s) such articles fall.[8]

The Wilson publications have the essential attributes of periodicals in that each issue is incomplete in itself, relating to other prior and subsequent issues, and in that there is a connection among the various issues with respect to content. Each issue provides current information as to published articles. For earlier or later articles on the same topic, or by the same author, other issues must be consulted. The issues strive to provide current information; that is their content. There is a connection, a continuity of content, in that subject headings under which the current information is grouped are retained from issue to issue to provide the subscriber with a consistent format from which to locate articles and to appraise the amount and nature of the interest the topic is then generating in the relevant professional field.

The Third Circuit has recently declined to revoke second class mail privileges for issues of "Current Contents," publications designed, as are Wilson's, to alert subscribers to recently published articles in other periodicals. See, *Institute for Scientific Information, Inc. v. United States Postal Service*, 555 F.2d 128 (3 Cir. 1977).

The Postal Service asks this Court to follow a recent decision of a district judge of the District of Columbia, *Standard Rate and Data Service, Inc. v. United States Postal Service*, Dkt. No. 77–0299 (D.D.C., July 20, 1977), in which revocation of second class mail privileges was upheld. In that case, the publications presented, under standardized headings in tabular form broken down by states, cities, towns and other categories, data to aid the prospective purchaser of advertising in newspapers, magazines, radio and television. The data included rates, coverage and requirements for placement.

Expressing no view as to whether *Standard Rate, supra*, was decided correctly, we note that there is a vast factual difference between the mere listing of rates and requirements involved in *Standard Rate*, and the skilled editorial analysis, requiring highly technical expertise in library science and specific topics, employed by the Wilson Company's editorial staffs.

The Postal Service also claims that it has consistently applied the *Houghton* definition of a periodical in administrative proceedings involving the denial or revocation of second class mail privileges. Yet the agency cites only two Postal Service decisions, one in 1964 and one in 1973, in support of its argument that it has consistently applied *Houghton*. What the Postal Service has done consistently since *Houghton* is grant original entry as second class mail to six of the eight Wilson publications involved and grant re-entry as second class mail to the publications on numerous occasions.

---

**8.** Indeed, as long ago as 1902, in *Payne v. United States ex rel. National Railway Publishing Co.*, 20 App.D.C. 581 (1902), *appeal dismissed*, 192 U.S. 602, 24 S.Ct. 849, 48 L.Ed. 583

(1904), cited in *Houghton*, railway guides were recognized as periodicals entitled to second class mail privileges. The guides contained railroad and steamboat time-tables.

We should be mindful of Justice (then Judge) Cardozo's words: "Not lightly vacated is the verdict of quiescent years." *Coler v. Corn Exchange Bank*, 250 N.Y. 136, 164 N.E. 882 (1928), *aff'd.*, 280 U.S. 218, 50 S.Ct. 94, 74 L.Ed. 378 (1930).

Plaintiff's motion for summary judgment is granted; defendant's motion for summary judgment is denied.

Settle a Final Judgment on five (5) days notice.

So Ordered.